# Derr *versus* Greenawalt.

1. A will was duly proved to have been executed in the presence of two witnesses with a blank left for the name of the residuary legatee. One witness swore that the name was inserted in the presence of the testator and by his direction. The person who inserted the name testified that he wrote it but could not recollect whether he did so by the direction of the testator or in his presence. This with subsequent declarations of the testator that the person named was his legatee and the fact that the will continued a long time afterwards in the possession of the testator : *Held*, insufficient to establish the residuary bequest.

2. Proof of execution of a will must be by two witnesses each of whom must separately depose to *all* the facts necessary to complete the chain of evidence.

3. Circumstantial proof cannot be made by two or more witnesses as to different parts of the aggregate circumstances going to make up the necessary sum of proof; the evidence of each must go to the whole.

4. Hock *v.* Hock, 6 S. & R. 47, adopted.

May 18th 1874. Before AGNEW, C. J., SHARSWOOD, WILLIAMS, MERCUR and GORDON, JJ.

[Derr *v.* Greenawalt.]

Error to the Court of Common Pleas of *Lebanon county :* Of May Term 1874, No. 15.

This was a feigned issue from the Register's Court, filed in the Court of Common Pleas December 15th 1871, in which William M. Derr, acting executor of L. T. Calvin Greenawalt, deceased, was plaintiff; and Lorenzo Greenawalt, Wilhelmina Greenawalt and Catharine Greenawalt, "some of the heirs at law" of L. T. Calvin Greenawalt, deceased, were defendants.

The particular issues directed to be tried were :—

1. "That the paper admitted to probate is not the last will and testament of the said L. T. Calvin Greenawalt.

2. That at the time of the alleged execution of the paper, the said L. T. Calvin Greenawalt was of non-sane disposing mind, memory and understanding.

3. That said paper was procured from him by fraud and co-ercion.

4. That the said paper was procured by the exercise of an undue influence on the mind of the said L. T. Calvin Greenawalt.

5. That the residuary clause, in said alleged will, by which the testator gives "to his friend William M. Derr, his heirs and assigns for ever, all his estate, real, personal and mixed, not otherwise in said will disposed of, &c.," was procured by fraud and undue influence exercised on the mind of the testator.

6. The name of William M. Derr was interpolated in the residuary clause of said alleged last will and testament, which begins as follows : ' I give and devise unto my friend William M. Derr, his heirs and assigns for ever, all my estate, real, personal or mixed, not otherwise herein disposed of, &c.,' after the name of the testator was affixed to said alleged will, and without authority from him."

The will was dated December 16th 1867.

After directing the payment of his funeral expenses and debts, he gave to his mother all his estate of every kind for life; and after her death, to his aunt, Maria Greenawalt, for her life, authorizing his executors, if they deemed it advantageous, to sell his real estate, invest the proceeds, and pay the income to his aunt during her life. He gave to Catharine Camyer $200, to be paid to her on the death of his mother.

Then followed these clauses :—

"Item. I give and bequeath unto Grant Weidman, Esq., for professional services heretofore rendered to me, the sum of $50, to be paid unto him by my hereinafter-named executors as soon as practicable after the death of my mother.

"Item. I give and bequeath unto my friend and attorney William M. Derr, the sum of $500, to be paid him as soon after the death of my mother as conveniently can be done.

"Item. In case my right and title in and to the real estate

[Derr v. Greenawalt.]

herein disposed of should by any one be contested, I give and bequeath unto my hereinafter-named executors the sum of $1000 for the purpose of contesting and settling title, &c. * * *

"Item. I give and devise unto my friend William M. Derr, his heirs and assigns for ever, all my estate, real, personal or mixed, not otherwise herein disposed of, and all the rest, residue and remainder of my estate, remaining after the death of my mother and aunt Maria, to him, his heirs and assigns for ever, to be fully enjoyed by him, his heirs and assigns for ever, after the death of my mother and aunt Maria, subject to the legacies herein bequeathed. * * *

"And lastly, I nominate, constitute and appoint my two friends, William M. Derr and David S. Raber, to be the executors of this my last will and testament.

"In witness whereof, I, L. T. Calvin Greenawalt, the testator, have to this, my will, written on one sheet of paper, set my hand and seal, this 16th day of December, A. D. 1867.

"L. T. C. GREENAWALT, [L. S.]

"Signed, sealed, published and declared by the above-named L. T. Calvin Greenawalt, as and for his last will and testament, in the presence of us, who have hereunto subscribed our names at his request, as witness thereto, in the presence of said testator and of each other.                Witness: { JULIANA HUBER.
                                                { LYDIA G. FRANTZ."

The will was executed, with a blank left for the name of the residuary legatee, which was afterwards inserted.

The question raised and decided in the Supreme Court—there being no fraud or undue influence in the case—was whether the filling up of the blank was so proved as to make it part of the will.

The cause was tried, January 8th 1872, before Pearson, P. J.

Lydia Frantz testified that she witnessed the will at the testator's request and in his presence. The will was not read then.

Juliana Huber testified that she witnessed the will in the presence of the testator and at his request.

On cross-examination she said: "I wrote the date '16 December;' he was sick in bed at the time at his house. His mother was present; his mother told me to ask him whether he had signed his will; he said no; said wanted to change the clause to give Kitty Cammeyer more; I asked if all was in the will right that he wanted but Kitty; as to his mother, all right; told me to get the will, after he considered a little; said he would sign it; will was in his desk; he was in bed when he signed it; I supported him; he held the paper himself; I asked to make his mark; he replied he thought he could write his name; had been very sick; was then better; think Miss Frantz assisted me to hold him; not certain; name of Wm. M. Derr was not in the will when I signed

26 P. F. SMITH—16

[Derr *v.* Greenawalt.]

it; it was written in about two hours after by my son George; the blank was discovered thus: Greenawalt said, Take the will to Derr; tell him to put in what he wanted; that Mr. Derr knew what he wanted to have put in; I went to Mr. Derr's office; told him what the other said; Derr opened the will; said everything was in it that Calvin wanted in, but if he wanted him to act as his attorney he must put his (Derr's) name in; I told him to come along and have it fixed; Derr replied he would rather have nothing to do with it; I asked who'd put the name in; he replied any one could do it, who Greenawalt would direct, but he would rather have nothing to do with it; Calvin said, Tell Derr to put in what I wanted in; Derr knows what it was; I asked Derr where the name to go in; he pointed it out; I observed the blank place; Derr said, You go get my name in and I will see him to-morrow; I told what Derr said; Derr said, If you (Calvin) want Derr to act as his attorney, must put his name there; Calvin asked me to put it in; I said better wait till my son comes, he will do it; this about 4 o'clock; my son came in soon and inserted the name; Greenawalt tried to point out the place to my son George to put it in; he too weak, and said, Your mother will show it; his mother was there; George was there, and I think Miss Frantz; not certain; Calvin brought the will to my house and read it over about three months before; he came to the blank; said going to put his mother's relative (Zimmerman) name in; he took it away with him; after the will was executed, he asked me to take it home with me; I took it home; kept it from December till some time in March; I took it back, gave it to his mother, and she put it in his desk; was found there after his death; he lived not quite four years after its execution; knew him from boyhood; he was a smart man; same blank was filled up that was spoke of as to be filled with name of his mother's relative, with that of Mr. Derr; he often spoke of his will, but never read it to me; he always told me it was to go the Zimmermans; always after he signed the will spoke of it as though the Zimmermans were in; always said his mother provided for; Maria provided for, and should all go to the Zimmermans; Greenawalts should not have any of it; never spoke of any one to take care of his mother and Maria; always swore at the Greenawalts; said they should have none of it; gave Derr $500 to fight it through; said gave Weidman a small amount; I asked why he gave it to Mr. Derr; his mind was perfectly good when he signed the will; he was worse after; his mind as good then as any time I knew him; when I took it he said, Just take it to William Derr; he knows what I want; he wanted it in to make Mr. Derr his attorney; he said he thought that was all fixed, he was in attorney; Mr. Derr refused to put his name in, but said for him to get it put in; get Calvin to put my name in, and I will come to see him to-morrow."

[Derr *v.* Greenawalt.]

On cross-examination she said:—

"My son not there, but when George came in Calvin tried to point out the place; said I am too weak, your mother will show you; George then wrote it in; George wrote it in but one place; he always said the Zimmermans to get his property; said this after the will signed as well as before; his mother said to me, Ask him if he has signed his will; you will have more influence over him than any one else; I probably had some influence; he often asked my advice; he was taken sick eight or ten days before; he had mania second day after the will was signed; he was not that I can say a confirmed drunkard; he got it from not using his usual quantity of liquor; I asked him if everything was in right as he wanted; he said to take it out to Derr; see if all right; he knew what he (Calvin) wanted; Lineaweaver attended him as physician about the time he made his will; Dr. Mish was often in; I had a judgment entered the day he had mania; he signed the bond day he did the will, and at the same time the name was inserted; done in presence of George, when he put that name in; I told George the purpose of the name going in; to go in as his attorney; I never gave a thought to how the name was in; know his name in as attorney only; said the Zimmermans were to go in and he to sign it; I told him the will of no account unless he sign it."

George Rise testified: "This name is my writing; I cannot tell at whose instance I put it in; was done at Greenawalt's or Derr's office; I know I wrote it in; can't say where or who present; if at Derr's office, he present; if at Greenawalt's house, he present; if at his house, my mother present; witnessed a bond; I was called on purpose to witness the bond; I never gave a thought to the other transaction; did to the bond; I stopped at Derr's office I knew, and therefore confused in the matter about where the name was inserted; I knew nothing of the contents of the paper; I think I knew it a will, only know the name my writing; I think I knew was Calvin Greenawalt's."

Lydia Frantz recalled, said: "George Rise's name mentioned, but I don't know for what purpose; I don't recollect of seeing him there. The will was executed about 4 o'clock; was there when the will was taken out; don't know that I was when it was brought back; Mrs. Huber took it away; she to take it to Derr's; Calvin asked her to. Can't recollect of seeing George, or her returning with the will. Can't say if he was to sign the will or a judgment for Mrs. Huber. * * * He was a smart man. He was perfectly sane when he executed the will; knew what he was doing; perfectly sane. I was there three or four days before the will was made; a few days after will signed had mania. His liquor all measured out for him. He indulged for some years before; drank it habitually; I think Mrs. Huber took it out of the desk. He was too weak to read it; I refused at first to sign; said afraid to

[Derr *v.* Greenawalt.]

put my name to a paper; I did not know contents. His mother said was nothing but his will."

Cyrus Derr testified: " This will is in my writing; after written one blank near the end and another for the date; all my writing except ' Mr. W. M. Derr,' and 'December 16th,'—those words are not. Can't tell when I wrote it; may be four; may be seven years. I copied it from a will prepared by father. I not a member of the bar then."

Lydia Huber recalled, said: " This bond made up of an amount; he knew the items of the amount; knew all about it; signed at the same time the name was inserted in the will. This is the only will I ever witnessed for him.

" Bond drawn by Mr. Gritinger; done same day it was signed. He owed me money and various things. * * * I calculated the amount; soon after the will signed he said, now to have the bond prepared and he would sign it; I went got it drawn. The family very poor, but for assistance; I and the neighbors assisted them. * * * Derr lived near one-fourth of a mile off; will was not in Derr's office; except in my hands; was not out of my sight."

Plaintiff then called Dr. W. C. J. Smith, who testified that the testator had spoken to him against his relatives in terms of great bitterness, and said they should never get a cent after his death.

It was then proposed to prove by him :—

" That the testator frequently said to him and to other witnesses, since the date of the will, even as late as within a few weeks of his death, that he had his will prepared and ready in his possession, in which he had made full provision for the care of Maria Greenawalt during her life; to which Lydia Frantz and Juliana Huber were the subscribing witnesses; of which he had appointed William M. Derr and David S. Raber the executors; and by which he had made William M. Derr his residuary devisee and legatee, and that he requested and directed the witness and others to send for William M. Derr, as soon as he should be dead, to take charge of his estate and effects, so that the Greenawalt heirs could not get at his things. This testimony offered for the purpose of proving, confirming and identifying the instrument proved by Juliana Huber and Lydia Frantz and Geo. D. Rise, as the last will and testament of L. T. Calvin Greenawalt, deceased."

The offer was objected to by the defendants, rejected by the court and a bill of exceptions sealed.

Lydia Frantz, again called, said: " I never signed any other will as a witness for Calvin Greenawalt; I do not recollect of seeing Geo. Rise at the house that evening; I never saw the will after; merely signed it. The will was not read in my presence to or by the testator."

The will was then offered in evidence, and objected to because not proved as a will, and because the fraudulent introduction of

the name is equivalent to a forgery and destroys the whole instrument.

By the court: "We consider the insertion of the name of Mr. Derr unauthorized in law; that is, that the authority to make it has not been legally established. Therefore that part of the will must be treated as though there was a blank for the residuary legatee, and consequently so much of the will as relates to the residue cannot go into effect. We are not prepared to decide, as a question of law, that the name was inserted fraudulently. So far from it, Mrs. Huber proves that it was done exactly as directed by the testator; that Mr. Derr did not desire the bequest. The only fact which shows that the testator misunderstood what was inserted, is the proof of Mrs. Huber, that he intended the Zimmermans were to have his estate after the death of his mother, and that William Derr was to be his attorney. This question as to whether the name was inserted fraudulently or not, must be decided by the jury."

The will was authorized to be read as it stood at the time of its execution, leaving out the name of Derr as residuary legatee. A bill of exceptions was sealed for each party.

Will dated December 16th 1867, proved 31st of July 1871, was read.

Grant Weidman testified: "Knew C. Greenawalt from childhood. I attended to his business from the time I was admitted to practice till his death. Always spoke of Mr. Derr being associated with him relating to the trial of titles under his grandfather's will to the real estate which he then claimed; was before 1867. Derr took part in the beginning. I conducted it through; Derr a mere associate counsel. I was consulted by him generally; no other consulted except as to that particular point."

The plaintiff rested.

The defendants gave evidence for the purpose of showing the testator's want of capacity; that he had the consumption, had been sick for a long time; that in 1867 had delirium tremens, which lasted several weeks. They also gave evidence tending to show that he had been habitually intemperate; that under advice of physicians he took stimulants, and when they were omitted, *mania a potû* was brought on.

The evidence was, that except when the delirium was on him, his mind was sound and he was not easily imposed on. At the time Lydia Frantz was there he had incipient delirium. His undue use of liquor was from 1863 to 1869.

Defendants gave evidence also that testator frequently sent to Mr. Derr for money, that Derr sent it to him, that Mr. Derr paid one of the witnesses to wait on him, that he often sent for Mr. Derr when Derr would not come. Mr. Derr was at his house but

[Derr *v.* Greenawalt.]

twice whilst witness was waiting on him. Witness heard all their conversation.

There was evidence also that testator had said, about the time of his last sickness, that he had discovered that he had wronged his relations. He was sorry he had not discovered it before the death of his mother. She had died two years before him. Mr. Derr was not a relative of testator either by blood or marriage.

The defendants gave much evidence of the same character as the foregoing for the purpose of showing incapacity in the testator.

For the plaintiff in rebuttal :—

Catharine Cammeyer testified : " Calvin said he had a will written ; said it three months before it was signed ; I was there the day it was signed; Mrs. Huber and Lydia Frantz there; George Rise there the same afternoon. There was a blank in the will, but I heard no directions about it. Calvin took the will to Mrs. Huber. A couple of months after it was brought back ; was put in the desk; I saw it in the desk several times; was with the other papers ; papers carefully kept; said the property should go to his mother's friends after Maria's death ; this after the will was made. Know of no other will ; this the only one. Did not say who executors ; Lydia Frantz and Mrs. Huber witnesses. Don't know if Lydia there when George Rise was ; Calvin had no other desk ; kept his papers alone in it; was in his bed-room. I not there when the will was signed; she did not take the will away ; I think Calvin took it down. He said so ; always said the property was to go to the Zimmerman's after Maria's death ; always said this ; said it down to the time I left there. I heard him instruct Mrs. Huber to take the will out to Mr. Derr. This was the day it was signed."

Grant Weidman testified : " After Calvin's death, Funck asked for Lorenzo to move in take care of Maria; considered it not advisable to let him in; Calvin Greenawalt also spoke about the property ; said would be a contest under the will ; offered me the property to fight the other family ; always advised him to drop the bitterness ; we both said, if to be contested, better do it in his lifetime ; some debts ; the property not in good repair ; his father's old papers kept as if of value ; I thought the desk had been disturbed ; found the will ; think in a paper ; Derr said would retire if no will ; if one was written by him on blue paper ; he had no papers of value except in the desk."

Cyrus G. Derr testified : " I remember he told father he wanted him to write a will ; I cannot remember farther than this ; he said he wanted to give father all his property ; father said he did not want it; wanted nothing to do with it ; I think it was certainly left blank in the paper from which I copied, and I left it so ; the summer prior to my going to Reading, I had a conversation with

[Derr *v.* Greenawalt.]

Calvin; he said he was going to give father everything; and he must fight the Greenawalts; I said father would not take it so; I said if he wanted to fight them, should do it himself; more sympathy with him than with a stranger after his death; he said nothing about a will at that time, or having one; this must have been in 1870; I think in August."

Dr. C. D. Gloninger testified: "Calvin often said would give me the property, if I would fight the Greenawalts; said it often; his mind was intent on that; said if I would not take it, he'd give it to my son called after me; boy six or seven years old; this said within the last two years."

The plaintiff gave evidence that in 1869 the testator said he had made a will and disposed of all his property; that Maria should be provided for; that Lydia Frantz and Julia Rise (Huber) were witnesses; that as soon as his eyes were closed, he wished Derr and Raber, his executors, to be sent for. The will was found in his desk amongst his papers; that Mr. Derr found it, and as soon as he saw it said, This is the will; that Mr. Derr was there but once during his last sickness; that testator said he had willed his things to Mr. Derr, after Maria's death.

The evidence on both sides was that the testator was a man of much intelligence; was very firm and not easily influenced; "pretty positive; would not be led; not easy to impose on;" "if he had great confidence, would do whatever his friend wanted; at times would, at others not."

The following are points of the plaintiff and their answers:—

3. "If the jury believe from the evidence that the blank space in the residuary clause of the will was filled up by George D. Rise in the presence of Juliana Huber and the testator, and at the instance and request or by the authority of the testator, such insertion must be regarded by them as a portion of the same transaction at the execution of the will, and they must find in favor of the plaintiff in the issue, in the absence of mental incapacity, fraud or undue influence."

Answer: "This point answered in the negative. We do not consider the name of the residuary devisee as before the jury at all. The proof was adjudged insufficient to receive it, and the blank must be considered as remaining in the will at the time of its execution; one witness alone was insufficient to prove the power to insert the name. George D. Rise has no sufficient knowledge as to when or where the name was inserted—whether in the presence or by the direction of the testator or not. Miss Frantz was not there, and Mrs. Huber is the only witness; her evidence alone is insufficient."

4. "If the jury believe that the blank in the residuary clause of the will was filled up by George D. Rise in the presence of Juliana Huber and the testator, by his authority, within two hours

[Derr *v.* Greenawalt.]

from the original execution of the will, such insertion was a re-execution of the will in the presence of two competent witnesses, and they must find for the plaintiff in the issue, in the absence of mental incapacity, fraud or undue influence."

Answer: "We consider the proof of direction to insert the name of the residuary devisee is made by one witness only, and therefore insufficient. It requires the same solemnity as the original execution, else the statute might be avoided in most important particulars. Answered in the negative."

5. "If the jury believe that the testator instructed Juliana Huber, one of the subscribing witnesses to the will, immediately after its execution, to take the will to William M. Derr to have his name inserted, which Derr having refused, and such refusal being communicated to the testator, the testator directed the name to be inserted by George D. Rise, in the presence of Juliana Huber and himself, such direction was a part of the execution of the will, and being done in the presence of George D. Rise and Juliana. Huber, was a legal re-execution of the will, and the plaintiff in the issue is entitled to recover, in the absence of proof of mental incapacity, fraud and undue influence."

Answer: "The facts are not as supposed in this point. The testator gave no direction to take the will to Derr and have his name inserted in the blank, and George D. Rise does not prove that the name was inserted by him by direction of testator. He cannot (tell) when, where or by whose direction it was inserted."

8. "If the jury believe that the relations existing between the testator and the residuary legatee in the will at and before the time of the execution of the will, were not of so intimate a nature as to warrant the belief that undue influence was exerted on the mind of the testator by reason of such existing relations, they must find that the devise in favor of William M. Derr was a voluntary disposition of his estate, not against the policy of the law under the proof in the case, and in the absence of any other proof of undue influence, fraud or mental incapacity, the plaintiff in the issue is entitled to recover."

Answer: "As we understand the law, where an attorney in whom confidence is reposed is employed by a person to prepare his will, the most perfect good faith must be observed. If any very considerable legacy is given to the attorney, it devolves on him to show that the matter was perfectly understood by the testator, that no undue influence was used. The whole course of proof is changed so far as relates to such bequests. It rests on the attorney to prove that all was right, perfectly understood, and so intended by the testator."

9. "If the jury believe that there was no undue influence used upon the mind of the testator by the residuary legatee (of which there is no proof in the case), that the name of the said residuary

[Derr v. Greenawalt.]

legatee was inserted at the instance of the testator and by his authority, and against the consent of the said legatee, he not being present at the time, fraud cannot be presumed, and the plaintiff is entitled to recover."

Answer: "If this point is intended to apply to the residuary devisee, it is already decided in the negative. If to the residue of the will, we have already said that it is not destroyed thereby, so far as we may judge from the evidence."

10. "That no evidence has been submitted to the jury to prove that the plaintiff was the confidential counsel of the testator, or that at the time of the execution of the will he in any way acted in that capacity or had so acted for years, other than in the preparation of the will; and as it is in proof that the testator requested the said plaintiff to accept the residuary legacy mentioned, which he refused to do, there is no evidence of undue influence in consequence of confidential relations existing between the parties, of the exercise and employment of fraud to secure the said devise, and the plaintiff is entitled to recover."

Answer: "As already said, where a very considerable bequest (in proportion to the amount of the estate), is made to the attorney, (or even a scrivener) who drew the will, it rests on him· to show that all was fair and perfectly understood by the testator. In the present case $500 were given without any other reason stated than Mr. Derr being his attorney. The law looks with jealousy on every such bequest, and requires affirmative evidence on the part of the attorney that all was fair and perfectly understood; without that the bequest must fall. The jury must judge whether the matter, as also the situation of the estate, was perfectly understood by the testator. $1000 is given to the executors to carry on any contest which may arise concerning the real estate. As a matter of course the bequest does not take effect if there should be no contest. Whether this has all been explained to the satisfaction of the jury must be judged by them. We cannot say, as a matter of law, that there was no unfairness, or that the bequest to the attorney is good."

The court charged:— * * *

"Mr. Derr, under whose direction the will was drawn, is made residuary devisee. Whether that was so intended or not, is extremely problematical, as the witnesses prove that the conversation was about making Mr. Derr his attorney, and it is in proof, that both before and after its execution, he often spoke of intending to leave all the residue of his estate to his mother's family, and of having so disposed of it, yet they are not named. We have rejected the residuary clause, as not being legally inserted and authenticated—done after the will was executed, without republication. Yet you must decide whether it was or was not inserted fraudulently. If so done, it would vitiate the instrument. If

[Derr *v.* Greenawalt.]

honestly and fairly inserted as intended, it would have no such effect, but would merely defeat the residuary clause, and cut out that part of the devise. Such would be the case even if the testator supposed that he was only making Mr. Derr his attorney, if the latter also intended to be made the attorney, as he certainly used no undue influence then, but merely said if they wanted him to act as attorney to insert his name, and declined doing it himself. We are unwilling to think that such a fraud was practised as would vitiate the instrument. This more especially as the will was in possession of the testator for several years after. We might fairly infer that he had read and understood its contents from its long possession. The only fact which conflicts with that is the testator's declarations to Mrs. Huber, the witness, that the Zimmermans had the residue of his estate. The questions of mental capacity and fraudulent alteration are for your consideration. The will ought not to be set aside *in toto* on slight grounds, especially where the subscribing witnesses, and many others, say that his mind was good. The insertion of Mr. Derr's name by a third person, not interested, should scarcely be considered such a fraud as would vitiate the whole will, especially if done in presence of the testator; but we have already stated that it is not so authenticated as to render the devise of the residue valid. We might be led to infer from other circumstances that the testator did not know the residue of the estate was given to Mr. Derr by the will, but that he was merely to act as his attorney, as he proposed to give it to Doctor Gloninger, and when he declined the gift, wanted to bestow it on his infant son.

[" There is another principle which must have weight, in regard not only to this, but another clause in the will—$500 is bequeathed ' to my friend and attorney W. M. Derr.' The law looks with extreme jealousy on all bequests made to those who stand in a confidential relation and are instrumental in procuring its execution, and requires something more than mere formal proof of its signature. There should be evidence not only that it was fully known and understood by the testator, but also that it was his own spontaneous wish, uninfluenced by the person making or dictating the instrument. This applies most emphatically to those standing in the relation of attorney and client, as there is none more confidential. It has even been applied to physician and patient, clergyman and parishioner; in short, to all who are supposed to have great influence over the mind of the testator. In one case large bequests were made to the attorney who drew the will, and to the physician and clergyman who were present at its execution, and it was held void as to all, although they were gentlemen of the highest character for probity. Under this principle the jury may feel themselves obliged to reject the bequest of $500 to Mr. Derr, as it would seem that he prepared the will or directed its preparation.]

[Derr v. Greenawalt.]

" The bequest of $1000 to the executors to litigate the title to the estate would stand on a different footing, as that is not an absolute gift; it is only setting apart a fund for the purpose. If there should be no litigation, there would be no application of the fund or any part of it. In a contest, no more would be allowed out of the $1000 than a fair compensation for services. The appointment of the executors stands in the same situation; they are under the control of the Orphans' Court, and there is no good reason for vacating the office because one of them is the attorney who prepared the will. The jury can find one part of the will good, and vacate or nullify other parts, as they consider right under the evidence, according to the principles we have laid down. This, with the answers to the points presented by the parties, will sufficiently elucidate our views of the law."

The verdict was as follows:—

" A jury being called, &c., * * * who, &c., do say that they find in favor of plaintiff, Wm. M. Derr, excepting the fifth item of the will, which begins in these words: ' I give and bequeath unto my friend and attorney Wm. M. Derr, the sum of five hundred dollars ($500), to be paid him as soon after the death of my mother as conveniently can be done,' which we find in favor of the defendants. Also, the eighth item in the will, being the 5th and 6th specifications of issue made up, where the name of Wm. M. Derr was inserted in the blank space as residuary legatee, which item gives all the residue of the property to Wm. M. Derr, which, under the instructions of the court, we find in favor of the defendants, and that the name was inserted without lawful authority; but we do not find that the same was done by fraud or undue influence."

The plaintiff took a writ of error.

He assigned for error, amongst others:—

The part of the charge in brackets.

The answers to the plaintiff's 3d, 4th, 5th, 8th, 9th and 10th points.

Rejecting the offer of the testimony of W. C. J. Smith.

*G. Weidman* and *A. R. Boughter.*—Circumstances may supply the want of a second witness to a will, when they go directly to the immediate act of disposition: Carson's Appeal, 9 P. F. Smith 493; Jones v. Murphy, 8 W. & S. 295; Eyster v. Young, 3 Yeates 511; Miller v. Carothers, 6 S. & R. 215. Miss Frantz having signed as a witness, and Mrs. Huber having proved that she (Miss Frantz) was present, it is sufficient, although she herself does not recollect the circumstance: McKee v. White, 14 Wright 354. The transaction was one continuing act: Stahl v. Berger, 10 S. & R. 170. An acknowledgment by the testator in the presence of witnesses is equivalent to signing in their presence: Nick-

[Derr *v.* Greenawalt.]

erson *v.* Buck, 12 Cushing 332; Wallace *v.* Blair, 1 Grant 75. The testimony in the case, with that which was rejected on the point, shows a republication: Gable *v.* Daub, 4 Wright 224; Campbell *v.* Jamison, 8 Barr 498; Jones *v.* Hartley, 3 Wash. C. C. R. 481. The presumption is that when the testator directed the name of Mr. Derr to be inserted he understood its effect: Hoshauer *v.* Hoshauer, 2 Casey 406; 1 Redfield on Wills 536, 537. Retaining the will by the testator raises a strong presumption that he wished it to stand: Irish *v.* Smith, 8 S. & R. 573. The bare fact that Mr. Derr was testator's attorney, without more, would not vitiate the bequest: 1 Redfield on Wills 515, 529; Duffield *v.* Robeson, 2 Harrington 384.

*J. Funck,* for defendants in error, as to evidence of republication, cited Fransen's Will, 2 Casey 206; Gable *v.* Daub, 4 Wright 229. The Wills Act requires two witnesses. Each must testify to all the facts necessary, so that nothing may depend on the credibility of only one: Hock *v.* Hock, 6 S. & R. 47; Carson's Appeal, 9 P. F. Smith 502; Reynolds *v.* Reynolds, 16 S. & R. 88; Rohrer *v.* Stehman, 1 Watts 458; Mullen *v.* McKelvy, 5 Id. 399; Ginder *v.* Farnum, 10 Barr 100. The court laid down the law correctly on the question of a bequest to the testator's lawyer, &c.: Greenfield's Estate, 2 Harris 505. The rule is one of public policy: Boyd *v.* Boyd, 16 P. F. Smith 294; Shelford on Lunacy 317–323; Dean *v.* Negley, 5 Wright 317.

Mr. Justice SHARSWOOD delivered the opinion of the court, July 2d 1874.

The jury having found in favor of this will and against the defences of mental incapacity, undue influence and fraud, we are relieved from the necessity of considering many of the alleged errors, both in the reception and rejection of evidence, and the answers to the points and the instructions of the charge, which relate exclusively to those subjects.

The principal, indeed the only matter of which, in view of the verdict of the jury, this plaintiff in error has any right to complain, is the binding direction given by the court to the jury under the whole evidence, that the residuary bequest to the plaintiff in error must be rejected as not having been legally proved as a part of the will of the testator.

The will was duly proved to have been executed in the presence of the two subscribing witnesses, but with a blank for the name of the residuary legatee. This blank was afterwards filled, and the question presented is whether the act of filling up that blank was so proved by two witnesses as to make it in law a part of the will.

There is no difficulty in regard to the rule of law upon the

subject. That has been well settled and repeatedly applied in the prior determinations of this court. It was fully considered and discussed in Carson's Appeal, 9 P. F. Smith 493, in which the former cases are cited. That principle is well generalized in the language of Mr. Chief Justice Gibson in Hock v. Hock, 6 S. & R. 47 : "Proof of execution must be made by two witnesses, each of whom must separately depose to all facts necessary to complete the chain of evidence, so that no link of it may depend on the credibility of but one. When the evidence is positive there can be no difficulty, for the witnesses then attest the simple fact of execution itself; but where the evidence of one or both is circumstantial, each must make proof complete in itself, so that if the Act of Assembly were out of the question, the case would be well made out by the evidence of either. Circumstantial proof cannot, therefore, be made by two or more witnesses alternating with each other, as to the different parts of the aggregate of circumstances which are to make up the necessary sum of proof; the evidence of each not going to the whole."

The rule is a simple, intelligible one, but the difficulty in this, as it has been in other cases, is in its application. It is not easy for the mind to divest itself of the influence which facts sworn to by one witness have in corroborating the evidence of another, especially of supplying what is a mere *vacuum*—a failure or uncertainty of memory in another. This difficulty is well illustrated by the evidence in this case. The evidence of Mrs. Huber was direct and positive that her son, George Rise, wrote the name in the blank in the presence of the testator and by his express direction. Striking out the entire testimony of Mrs. Huber, is there sufficient evidence from other witnesses in the cause which would justify the submission of that fact to the jury? George Rise was unable to testify that he had inserted the name by the direction of the testator or in his presence. "This name," said he, "is my writing. I cannot tell at whose instance I put it in; was done at Greenawalt's or Derr's office. I know I wrote it in; can't say when or who present. If at Derr's office, he present; if at Greenawalt's house, he present. If at his house, my mother present; witnessed a bond; I was called on purpose to witness the bond. I never gave a thought to the other transaction." The only other witness present was Lydia Frantz. She could not recollect having seen George Rise there. She left after the first execution of the will. "I think I went home to tea." The circumstance of the execution of the bond would of course be material, but that it was done at the same time with the writing in the will depends solely upon the credibility of Mrs. Huber. Lydia Frantz does not remember it. What other circumstances then have we in the case? There is undoubtedly evidence of repeated declarations by the testator that Mr. Derr was his residuary legatee, though some

[Derr *v.* Greenawalt.]

evidence was given of declarations to the contrary. It is clear that they go for nothing: Hock *v.* Hock, 6 S. & R. 47 ; Clark *v.* Morton, 5 Rawle 235. Nor is the circumstance that the will continued four years from its date in the possession of the testator sufficient. Had there been no subscribing witnesses, and the will been proved by the testimony of two witnesses to the handwriting of the testator, it would perhaps have been sufficient primâ facie. The presumption may be that it was perfect when the testator subscribed to it. But the subscribing witnesses were there and must be called, and their testimony showed that the will was not perfect when he executed it. We are thrown back then upon the testimony of Mrs. Huber, as to when the blank was filled, and whether by the authority and at the instance of the testator. It might well be that, believing his instruction to have been followed, he had kept the will in his possession without further examination. It does not appear that he ever had the will in his hands after its execution. Even Mrs. Huber fails to prove that, but rather shows the contrary. " After the will was executed, he asked me to take it home with me. I took it home ; kept it from December till some time in March. I took it back, gave it to his mother, and she put it in his desk ; was found there after his death." Adopting Chief Justice Gibson's language in Hock *v.* Hock: " Strike out Mrs. Huber's testimony, and how will the case stand ? There would be a very material link wanting to connect the testator's declarations with the paper in question. It is said these two witnesses mutually strengthen and support each other. So much the worse. Each must be competent to the whole proof without aid borrowed from the other."

We are of opinion, therefore, that the learned judge below committed no error in the binding direction which he gave to the jury to reject the residuary bequest as no part of the will of L. T. Calvin Greenawalt.

As to the contention that no separate issue was directed as to the fifth item of the will, and the jury was not, therefore, empowered to find that to be no part of the will, as perhaps may be inferred from Hoxworth *v.* Miller, 7 Barr 458, it is sufficient to observe that no such point was made in the court below, nor has it been specifically assigned for error here.

Judgment affirmed.